1

2

3

4

5

6

7

8                      IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ADAM GONZALEZ,                          CASE NO. CV-F-03-5695 REC DLB HC

12              Petitioner,                   FINDINGS AND RECOMMENDATIONS_
                                              REGARDING PETITION FOR WRIT
13        vs.                                 OF HABEAS CORPUS

14   JIM HAMLET, WARDEN,                      [Doc. 1]

15              Respondent.
     _____/
16

17        Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28

18   U.S.C. § 2254.

19                            PROCEDURAL HISTORY[1]

20        Petitioner was convicted in the Tulare County Superior Court for two counts of arson of an

21   inhabited dwelling in violation of California Penal Code section 451, subdivision (b), conspiracy to

22   manufacture methamphetamine in violation of California Penal Code section 182, subdivision (a)(1),

23   and California Health and Safety Code section 11379.6, and attempt to possess psuedoephedrine

24   with intent to manufacture methamphetamine in violation of California Penal Code section 664,

25   California Health and Safety Code sections 11383, subdivision (c) and 11055, subdivision (d).

26        Petitioner was sentenced to nine years in state prison.

27   _____

28        [1] This information is derived from the petition for writ of habeas corpus and Respondent's answer.

                                              1

1    Petitioner filed a timely notice of appeal with the California Court of Appeal, Fifth Appellate

2    District.  On March 25, 2002, the Court of Appeal affirmed the judgment.

3    On May 1, 2002, Petitioner filed a petition for review to the California Supreme Court.  The

4    petition was denied on June 12, 2002.

5    Petitioner filed the instant federal petition for writ of habeas corpus on May 27, 2003.  By

6    order of July 21, 2003, the court directed Respondent to file a response to the petition.  Respondent

7    filed an answer on September 23, 2003, and Petitioner filed a traverse on November 17, 2003.

8    On December 6, 2004, the Court issued an order appointing counsel for Petitioner and

9    directing that supplemental briefing be provided in light of the Supreme Court's opinion in Crawford

10   v. Washington, 541 U.S. 36 (2004).  On January 3, 2005, Respondent submitted his supplemental

11   briefing.  On March 3, 2005, Petitioner submitted his response.

12                                    STATEMENT OF FACTS

13   Trial Testimony

14   Captain Michael Weger, an investigator with the California Department of Forestry and Fire

15   Protection and Tulare County Fire Department, testified that he investigated a fire at 24565 Avenue

16   82 near Terra Bella in Tulare County.  (RT 341-343.)  There were two residences on the property that

17   had been burnt to the ground and an unattached garage sustained major damage.  (RT 343.)  Mr.

18   Weger concluded that the fire in the two residences was caused by arson because there were multiple

19   points of origin, none near any potential causes for an accidental fire, such as electrical wiring or a

20   gas outlet.  (RT 350.)  It was not possible to determine if there was evidence, such as a pour pattern,

21   of use of an accelerant to start the fire.  (RT 410.)  Mr. Weger concluded that the fire in the garage

22   started because it was near the burning residences.  (RT 352-353.)

23   It was concluded that the fire in the other residence began where a flammable liquid had been

24   poured on the floor.  (RT 354.)  A plastic gasoline can was found nearby.  (RT 355.)  Mr. Weger was

25   of the opinion that the fire was started by arson.  (RT 362.)

26   There were two vehicles on the premises registered to Jesse Parraz and mail addressed to him

27   was found in the mailbox.  (RT 360-361.)

28   On August 13, 1999, Mr. Weger was requested by the Visalia Police Department to

                                              2

1   investigate a fire bombing at Petitioner's family residence.  (RT 363-364.)  A pipe bomb was

2   discovered on the floor of the residence.  (RT 364.)  Petitioner told Mr. Weger that he had cheated

3   Jesse Parraz in a drug deal, and that Parraz told him to burn down his home so he could get the

4   insurance money, and Parraz had hired someone to burn Petitioner's home to retaliate against him if

5   he did not burn Parraz's house.  (RT 365-367.)  Later that day, Mr. Weger received a phone call from

6   Detective Lopez indicating that Parraz was in custody for selling methamphetamine and that Parraz

7   stole drugs from Petitioner, and that Parraz thought that Petitioner burned Parraz's house.  Detective

8   Lopez advised Weger to cease the investigation of insurance fraud.  (RT 387-392.)

9       <u>Monica Rivera</u>, Jesse Parraz's wife, testified that she married Jesse in 1999, and resided at

10  the home that was burned on August 12, 1999.  The night it was burned she and her family stayed at

11  a motel because she had a doctor's appointment the next morning.  (RT 418-419.)  She testified that

12  she had never been threatened or warned to stay away from her house.  (RT 418-419.)  Ms. Rivera

13  met Petitioner through her husband and regarded him as a friend.  (RT 420.)  She indicated that she

14  talked to Petitioner approximately twice a week.  (RT 441.)  Although Ms. Rivera spoke with

15  Petitioner the day before the fire occurred, she could not recall the contents of that conversation.

16  (RT 422.)

17      Subsequent to the fire, Ms. Rivera and Jesse Parraz were arrested in Visalia by Detective

18  Corey Sumpter.  (RT 426.)  Police found a quarter pound of "dope" during the search.  (RT 449-

19  450.)

20      Ms. Rivera admitted telling Detective Sumpter that Jesse told her Petitioner had warned them

21  to stay away from the house the night of the fire.  (RT 427.)  She admitted that was one of the

22  reasons why they stayed in a motel that night.  (RT 428.)  She testified that Petitioner said he was

23  sorry, but she could not remember if Petitioner told her he caused the fire and at trial she did not

24  believe he had.  (RT 430-433.)

25      Ms. Rivera was aware that methamphetamine was being manufactured in the smaller

26  residence at her home; however, she never observed it.  (RT 450-452.)  Jesse and Petitioner were

27  partners in the manufacturing of methamphetamine.  (RT 467.)

28      Jesse told Rivera that he did not plant the pipe bomb at Petitioner's residence.  However,

1   Jesse told her that he had been arrested for it, along with Gaby (later identified as Gabriel Alvarez)

2   and Jose (later identified as Jose Mendez).  (RT 446-447, 580.)  Jesse told her that he stole ten

3   pounds of methamphetamine from Petitioner because he owed him money.  (RT 445, 458-459.)

4          After Rivera was released from jail she talked to Detective Lopez about trying to locate a

5   boxed methamphetamine laboratory, which was owned by Petitioner.  (RT 465-466.)

6          Detective Sumpter, of the Visalia Police Department, arrested both Parraz and Rivera for

7   selling methamphetamine on August 12, 1999.  (RT 478.)  Sumpter testified that Rivera told him that

8   Petitioner had burned her house and had warned her that it would be burned.  (RT 478-482.)

9          Parraz told Sumpter that he worked with Petitioner manufacturing methamphetamine and that

10  he supplied Petitioner with chemicals in exchange for methamphetamine and money.  Petitioner

11  owed Parraz $24,000, and the two had a falling out because Petitioner failed to pay the money.  (RT

12  528-529.)  Jose and Gaby also supplied Petitioner with pseudoephedrine.  (RT 531.)

13         Parraz told Sumpter that he had stolen the quarter pound of methamphetamine found in his

14  possession at the time of his arrest from Petitioner.  (RT 528.)  Parraz admitted that on August 10,

15  1999, he, along with Jose and Gaby, stole several pounds of methamphetamine from Lauro Haro's

16  residence, who was storing the methamphetamine for Petitioner.  (RT 530-531.)

17         Parraz claimed that Petitioner was angry because he had taken his methamphetamine.

18  Petitioner told Parraz that he would burn his house.  (RT 533-534.)  After the house was burned,

19  Petitioner admitted to Parraz that he had done it in retaliation and Parraz said he would burn his

20  house in exchange.  (RT 535-536.)

21         Parraz had previously worked with the Visalia Police Department as an informant.  (RT 487.)

22  As a result of this drug transaction, multiple individuals were arrested.  (RT 516.)

23         Detective Mark Lopez, with the Visalia Police Department, executed a search warrant on

24  September 1, 1999, at the Porterville apartment Petitioner occupied with his girlfriend.  (RT 548.)

25  Several items were seized including pay/owe sheets, plastic wrap, a receipt for denatured alcohol, a

26  list of phone numbers and names, a card describing MSM which is a diluting agent, and a bag of

27  creatine which is a cutting agent.  (RT 548-566.)  All of which are consistent with the manufacturing

28  of methamphetamine.  (Id.)

1    While Detective Lopez was at the residence, Petitioner's cell phone rang and pursuant to the

2    search warrant Lopez answered it pretending to be Petitioner.  (RT 568.)  The other party identified

3    himself as "Contratista" (later identified as Alfredo Corpus) and offered to provide  Petitioner with

4    40 nectarines. (RT 569.)  A meeting was set up.  (Id.)  As Detective Lopez believed the caller was

5    speaking in code terms, Petitioner acknowledged the transaction was about "bud."  (RT 572.)  After

6    several more phone calls Lopez met Corpus in the parking lot of a Shell station where Corpus

7    appeared with pseudoephedrine tablets in his vehicle and he was arrested.  (RT 576-578.)

8    One of the phone numbers contained in the phone list obtained from Petitioner's bedroom at

9    his girlfriend's apartment belonged to Gabriel Alvarez.  Police located Alvarez, who told Detective

10   Lopez that he was involved in manufacturing methamphetamine and supplying chemicals.  Alvarez

11   said that he, Parraz and a third individual stole nine pounds of methamphetamine from Petitioner that

12   was stashed at Haro's house.  (RT 580.)

13   On September 1, 1999, Lopez interviewed Petitioner at the Visalia Police Department.  A

14   videotaped statement of the interview was shown to the jury.  (RT 603, 604, 614, 802.)

15   On September 2, 1999, Lopez went to Haro's house in Tonyville and obtained his consent to

16   search the residence.  Haro admitted that he held methamphetamine for Petitioner.  Haro admitted

17   that Parraz, Gaby and Jose had taken 8-10 pounds of methamphetamine from him at gunpoint.  (RT

18   581-583.)

19   On September 1, 2000, Petitioner was interviewed by Detective Lopez at the Visalia Police

20   Department, Petitioner was advised and waived his Miranda rights.  (CT 436.)

21   Petitioner admitted that he knew people who sold ephedrine.  (CT 442.)  Petitioner indicated

22   that Alfredo Corpus was bringing ephedrine to him, and that he was going to give it to somebody

23   else or put Corpus together with another person.  (CT 444.)

24   Petitioner introduced Parraz to Ruben Ventura, and Parraz stole $20,000 from Ventura.  (CT

25   458.)  The night before Parraz's house burned, Petitioner took Ventura to Parraz's home and he

26   believed Ventura was going to steal from the home.  (CT 462-462, 467.)  Petitioner told Rivera not

27   to go to her house.  (CT 471.)  Petitioner believed that Ventura burned Parraz's house to send a

28   message that Ventura wanted his money back.  (CT 484.)

5

1    Petitioner told Detective Lopez that he knew the pipe bomb came from Parraz.  (CT 442.)

2    Petitioner believed that a methamphetamine user from Visalia made the bomb.  (CT 559.)

3    Petitioner said he would kill Parraz if he could, and that he would get to Parraz in prison.  (CT 491.)

4    Petitioner admitted that he lied when he told Officer Camacho that Parraz's home was burned

5    for insurance purposes.  (CT 499.)

6    Petitioner claimed to owe Parraz $2,000 for a BMW automobile.  (CT 505.)

7    Petitioner told Lopez that the night before Parraz's house burned, he and Parraz were

8    supposed to meet at a Taco Bell at Mary's Vineyard.  When Parraz did not arrive, Petitioner phoned

9    Ventura and the other men who were at Parraz's house and told them to burn it.  (CT 592.)

10    Petitioner acknowledged Lauro Haro's house was used as a "stash" house.  He acknowledged

11    the theft of methamphetamine occurred the day before Parraz's house burned.  (CT 638.)

12    Approximately ten pounds of methamphetamine were taken.  (CT 640.)  Lauro told Petitioner that

13    Parraz, Gaby and Jose, took it.  (CT 644.)  Petitioner claimed the X-Men, who cooked the

14    methamphetamine, owned it.  (CT 652-653.)

15    Petitioner told Detective Lopez that Parraz admitted to stealing the methamphetamine and

16    had agreed to return it to him at a meeting at Taco Bell.  (CT 659.)  When Parraz did not show up,

17    the X-men burned Parraz's house.  (CT 664.)

18    Petitioner admitted that he sold dope because it was easy money.  (CT 668.)

19    Officer Gerdes, of the Visalia Police Department, testified that he assisted in the search of

20    Petitioner's girlfriend's apartment in Porterville and arrest of Mr. Corpus.  He recovered a paper

21    from Corpus's wallet with Petitioner's phone number on it, and found several hundred loose tablets

22    and bottles of pseudoephedrine.  (RT 620-628.)  He indicated that pseudoephedrine is a nasal

23    decongestant that can be mixed with denatured alcohol and heated in order to extract ephedrine, as

24    part of the process of manufacturing methamphetamine.  (RT 629-634.)

25    Lauro Haro, testified that he met Petitioner in August of 1999, and indicated that Petitioner

26    asked him to store methamphetamine.  (RT 647, 688.)  Haro picked up a quantity of

27    methamphetamine from a residence in Terra Bella and took it to his residence in Lindsay and stored

28    it.  (RT 648.)  Petitioner gave Haro a pound of methamphetamine in return for his service.  (RT 649.)

6

1   A couple weeks before September 2, 1999, three other men came to his house, and took the

2   methamphetamine at gunpoint.  (RT 651-657.)  Haro told Petitioner that his friends had taken the

3   methamphetamine.  (RT 658.)

4       Mark Kalchik, a criminalist for the California Department of Justice, examined the tablets

5   found in Corpus's vehicle and confirmed that they contained pseudoephedrine.  (RT 788, 794.)

6       Officer Jerry Diaz, of the Woodlake Police Department, assisted in the search of Petitioner's

7   family residence in Woodlake, where he confiscated more pay/owe sheets, lye, and a breathing

8   apparatus.  (RT 804-806.)

9       Ann Kromberg, of the Drug Enforcement Agency, testified that it is illegal to sell more than

10  30 grams of pseudoephedrine.  (RT 834.)  Kromberg arranged for the subpoena of telephone records

11  and residences of Gaby and Jose.  Gaby was interviewed on September 23, 1999, and Jose was

12  interviewed on September 28, 1999.  (RT 856.)  Jose told Kromberg that he supplied chemicals to

13  manufacture methamphetamine.  (RT 838, 845.)  She testified that the method of manufacture used

14  in this case was called the Mexican cook or pseudoephedrine red phosphorus method.  (RT 853.)

15  A.      Jurisdiction

16      Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

17  to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

18  the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

19  375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as

20  guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Tulare County

21  Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

22      On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

23  1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

24  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct.

25  586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting Drinkard v. Johnson, 97

26  F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other*

27  *grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable

28  to cases filed after statute's enactment).  The instant petition was filed after the enactment of the

7

1   AEDPA and is therefore governed by its provisions.

2   B.      Standard of Review

3          This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

4   pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

5   Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

6          The AEDPA altered the standard of review that a federal habeas court must apply with

7   respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v.

8   Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus will

9   not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or

10  involved an unreasonable application of, clearly established Federal law, as determined by the

11  Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable

12  determination of the facts in light of the evidence presented in the State Court proceeding." 28

13  U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's

14  approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct.

15  1495, 1523 (2000).  "A federal habeas court may not issue the writ simply because that court

16  concludes in its independent judgment that the relevant state-court decision applied clearly

17  established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations omitted).  "Rather,

18  that application must be objectively unreasonable."  Id. (citations omitted).

19         While habeas corpus relief is an important instrument to assure that individuals are

20  constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983);

21  Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal

22  conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.

23  Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's factual

24  determinations must be presumed correct, and the federal court must accept all factual findings made

25  by the state court unless the petitioner can rebut "the presumption of correctness by clear and

26  convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769

27  (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380,

28  1388 (9th Cir. 1997).

1  C.      Admission of Petitioner's Statement

2          Petitioner contends that his statements to Detectives Diaz and Lopez were the products of

3  unlawful police coercion, threats and promises.  Specifically, Petitioner contends that Detectives

4  Lopez and Diaz told Petitioner that he must talk to them in order to help them find the person who

5  threw a bomb at his mother's residence.  Petitioner contends Detectives promised protection for his

6  family, if he confessed.  Further, Petitioner contends that the Detectives threatened to place in their

7  police reports the statement that Petitioner had buried $20,000 at his mother's residence, thereby

8  subjecting Petitioner's family to risk of harm.

9          "'A confession is involuntary if coerced either by physical intimidation or psychological

10 pressure.'" United States v. Crawford, 372 F.3d 1048, 1060 (9th Cir. 2004) (quoting United States v.

11 Haswood, 350 F.3d 1024, 1027 (9th Cir. 2003).  In determining whether a defendant's confession was

12 voluntary, 'the question is whether the defendant's will was overborne at the time he confessed.'

13 Psychological coercion invokes no per se rule." Crawford, at 1060 (Citations omitted.)  A court

14 must review the totality of the circumstances surrounding the confession to determine the effect upon

15 the will of the defendant.  Id.  The alleged coercive conduct must be casually related to the

16 confession, such that there is a "link between coercive activity of the state, on the one hand, and a

17 resulting confession by a defendant, on the other."  Colorado v. Connelly, 479 U.S. 157, 165 (1986).

18         Prior to trial, the trial court heard testimony by both Detectives Lopez and Diaz and defense

19 counsel's expert Dr. Terrell regarding the voluntariness of Petitioner's statements to Detectives.

20 Based on a review of the testimony, the trial court concluded that:

21         [T]he officers are indicating that based on the information that the [Petitioner]
           Mr. Gonzalez is giving them, that they can't protect him or his family unless they're
22         armed with the knowledge of exactly what was the motive for Parraz to be angry or
           wanting to get revenge against Mr. Gonzalez and just who might have these motives.
           And the Court doesn't think that - - those kinds of statements are untruthful.
23         If, in fact, it is the duty of law enforcement to protect [Petitioner's] mother and sisters
           from persons that are bent on seeking revenge against [Petitioner], for whatever
24         reason, it's important that the officers know or have some idea about who those
           persons are.  And without that knowledge they are hardly in a position to protect
25         them.
           And although [Petitioner] was telling these officers it was Parraz, the fact is
26         that the officers, in order to adequately protect his mother and sisters and based on
           some of the knowledge that was obvious that they already developed, may have had
27         cause and did obviously have cause to believe others may have been involved and
           may have had reason to go after them too.
28

9

1    So it wasn't untruthful.  And whether it was overbearing and brought about
statements or admissions not freely determined in the sense that the questioning did in
2    *People v. Esqueda*, I am not prepared to find.
I think that the People have met their burden by a preponderance of the
3    evidence that the statements were voluntarily made.
And the Court is in agreement that the interrogation obviously took place over
4    a two-and-a-half-hour period.
I'm convinced, based on this hearing that I've conducted here, that the
5    interrogation in the police department began just within a couple of minutes of this
videotape being turned on.  The videotape begins right at the beginning of the
6    interrogation.
There are obviously things said through questioning of the officers about what
7    they were saying at the time this search warrant was conducted at his girlfriend's
house in Porterville on "F" street, the [Petitioner's] girlfriend's house, as well as at
8    his mother's house.
But the Court doesn't believe that those statements, at least as reported by
9    those officers, when taken together with this interrogation, should lead the Court to
believe that the [Petitioner's] influences were brought to bear as to overbear the
10   [Petitioner's] will to resist and make statements and admissions not freely
determined. []
11   I viewed the [Petitioner] on the videotape.  He never seems exhausted.  He
never asked to stop.  He never asked - - he never - - it never appeared to the Court that
12   he was beaten, exhausted - - beaten in the emotional sense, exhausted, or that his free
will was overcome.
13   [Petitioner] obviously engaged in a lot of verbal sparring with these officers.
And the Court heard no promises of leniency given to him.
14   And, as I've indicated, the [Petitioner] even seemed aware that he would be
facing charges at the conclusion of this interrogation and that he wasn't afraid of
15   going to prison.

16   (RT 162-165.)

17   Petitioner argues that the alleged statement by Detectives that they could not protect his

18   family and bring the bomber to justice if Petitioner gave them false accounts of what transpired

19   coupled with the fact that Detectives told him that the fact that Petitioner hid $20,000 at his mother's

20   residence may be revealed in the police report constituted coercion.  In view of the totality of the

21   circumstances surrounding the interview of Petitioner, neither of the alleged promises or threats

22   constituted coercion.  As noted by the Court of Appeal, these statements were mere observations by

23   officers of the harm that Petitioner had placed his family in by his drug dealings.  The statements

24   were further assertions that false accounts by Petitioner would not assist the officers in capturing the

25   individual who placed the bomb at Petitioner's mother's residence.  Both statements are reasonable

26   responses to Petitioner's alleged concern regarding his family's safety.  The fact that officers

27   informed Petitioner that he hid $20,000 at his mother's residence would be revealed in their report

28   and further subject to his family to harm, is a mere reality of the harm to which Petitioner himself

10

1    had placed upon his family.  This statement does not amount to coercion on the part of police.

2    Petitioner volunteered the information and the mere fact that police informed him that it would be

3    written in a police report does not amount to coercion on their part.  The officers merely disclosed

4    the realty of the potential threat his family could face regardless of whether Petitioner chose to

5    disclose the truth or not.

6         Further, there is no casual connection between that statement and Petitioner's resulting

7    confession.  After Detectives informed Petitioner that the statement would be placed in the police

8    report which could place his family at risk, Petitioner continued to deny and downplay his

9    involvement in the drug transaction.  It was not until way later in the interview, after Detectives

10   pointed out holes in Petitioner's story, that Petitioner finally confessed and disclosed the truth about

11   his involvement in the drug deal.  There was no link between the Detectives statement and

12   Petitioner's later confession, nor does Petitioner provide such a link.  Moreover, there was no link

13   between the alleged promises by Detectives that they could not protect Petitioner's family unless he

14   confessed.

15        Additionally, as stated by the Court of Appeal,

16        [Petitioner] cites as error police promises to protect his family and their
          alleged threats to reveal that [Petitioner] had hidden $20,000 at his family's home and
17        general accusations that [Petitioner] was not being truthful with police.  These
          statements by police did not constitute coercion.  Rather, they were merely
18        observations that [Petitioner's] statements were inconsistent with other evidence they
          had collected, observations about the apparent danger he had put his family in with
19        his drug connections.  The statements were also assertions that false accounts by
          [Petitioner] would not assist in the detectives' search for or prosecution of the
20        bombers.
              For example, Detectives Lopez and Diaz explained to [Petitioner] that his
21        account of events leading up to the arson and bombings were not consistent with the
          statements of others that Parraz had stolen drugs from [Petitioner], showing that
22        [Petitioner] had motive to burn Parraz's house.  The detectives also observed that the
          escalation from cheating in drug deals, to theft, to arson, to bombing described by
23        Parraz seemed a more logical explanation for the chain of retaliation between him and
          [Petitioner] than [Petitioner's] explanation that Parraz had absconded with $20,000
24        belonging to a mysterious third party.  These statements by the detectives were thus
          mere observations about facts indicating that [Petitioner] was not telling them the
25        truth.
              Likewise, the police statements that [Petitioner] could help protect his family
26        if he truthfully told them about his involvement with the suspects were also
          permissible observations of the reality of [Petitioner's] situation.  The police
27        truthfully observed that [Petitioner's] family was apparently still in danger because of
          [Petitioner's] drug dealing.  They also observed that false accounts by [Petitioner]
28        would not help the police prosecute the bombers and protect his family.  These

                                              11

1

2

3

> statements were thus not promises that they would only protect his family if he
> inculpated himself.  Rather, they were simply observations of the facts [Petitioner]
> should face in determining whether to assist in their investigation by giving an
> accurate and credible account of events leading to the bombing.

4

(Exhibit D, attached to Respondent's Answer, at 10-11.)

5

6

A review of the totality of the circumstances surrounding the interview supports the finding

that Petitioner's confession was voluntary.  Petitioner voluntarily went to the police station to speak

7

with officers regarding the bomb placed at his mother's residence, Petitioner was advised of his

8

Miranda rights, the interview lasted for only two and a half hours, Petitioner never asked to leave the

9

interview, or expressed any feeling that he was being coerced or threatened into confessing about his

10

involvement in the drug transaction.  The transcript of the police interview reveals that Petitioner

11

willingly disclosed his involvement to police in an attempt to help police discover who placed the

12

bomb at his mother's residence.  Throughout the interview Petitioner readily acknowledged that he

13

was not innocent and had engaged in "bad" conduct.  (CT 467, 510, 548, 607.)

14

For the foregoing reasons, the state courts' determination of this issue was not contrary to, or

15

an unreasonable application of, clearly established Supreme Court precedent.

16

D.    Admission of Parraz's Statements

17

Petitioner contends that the admission of Parraz's out of court statement that Petitioner

18

threatened to burn down Parraz's house was inadmissible hearsay.  Petitioner further contends that

19

Parraz's out of court statements implicating him in the manufacture and sale of methamphetamine,

20

were improperly admitted and constituted prejudicial error.

21

Prior to trial, Mr. Parraz invoked his Fifth Amendment right not to testify and incriminate

22

himself at Petitioner's trial.  (RT 99.)  The court found that Mr. Parraz was unavailable within the

23

meaning of the California Evidence Code.  (Id.)  The court allowed the statements by Parraz to come

24

in through the Detectives that interviewed him.  Specifically, the court ruled that Parraz's statement

25

concerning his drug involvement were admissible as a declaration against interest, and the statements

26

about burning Parraz's house were admissible as a threat of injury.  (CT 266-268; RT 19, 238-240.)

27

At trial, Detective Sumpter testified that after Mr. Parraz was arrested an interview was

28

conducted, and Mr. Parraz revealed that he had stole methamphetamine from Petitioner.  (RT 528.)

12

1  Mr. Parraz indicated that he would supply Petitioner with chemicals and other items that are needed

2  for the manufacturing, and in turn would be paid compensation by Petitioner.  (Id.)  There was

3  apparently a fallout between Petitioner and Mr. Parraz because Petitioner owed Mr. Parraz money.

4  (RT 529.)  In revenge, Mr. Parraz stole Petitioner's methamphetamine that was stored at a stash

5  house in Lindsay.  (RT 530.)  Mr. Parraz told Detective Sumpter that he had contacted Petitioner,

6  who was angry.  (RT 533.)  Mr. Parraz indicated that Petitioner threatened him and told him that he

7  was going to burn his house down.  (RT 534.)  Mr. Parraz further indicated that Petitioner admitted

8  to him that he had burned his house in retaliation for the theft of his methamphetamine.  (RT 535.)

9  In return, Mr. Parraz stated that he was going to burn Petitioner's house down.  (Id.)

10      Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a

11  federal habeas corpus proceeding. Estelle, 112 S.Ct. at 477; Middleton v. Cupp, 768 F.2d 1083, 1085

12  (9th Cir.), cert. denied, 478 U.S. 1021 (1985).  Nevertheless, there can be habeas relief for the

13  admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial

14  of due process. Estelle, 112 S.Ct. at 482; Pulley v. Harris, 465 U.S. 37, 41, 104 S.Ct. 871, 874

15  (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180, 1192

16  (9th Cir. 1993), cert. denied, 510 U.S. 1191, 114 S.Ct. 1294 (1994); Gordon v. Duran, 895 F.2d 610,

17  613 (9th Cir.1990).  The failure to comply with state rules of evidence alone is neither a necessary nor

18  a sufficient basis for granting federal habeas relief on due process grounds.  Jammal v. Van de

19  Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991).  Only if there are no permissible inferences that the

20  jury may draw from the evidence can its admission rise to the level of a due process violation.  Id. at

21  920.  Intent is a permissible inference that the jury may draw from the evidence of prior bad acts.

22  See, Houston v. Roe, 177 F.3d 901, 910 n. 6 (9th Cir. 1999).

23      The admission of evidence in a state trial is not subject to federal habeas review unless it

24  violates a specific constitutional right. Henry v. Kernan, 177 F.3d 1152, 1159 (9th Cir.1999).

25  Petitioner must show that there were no permissible inferences to be drawn from admitted evidence

26  and that the evidence is "of such quality as necessarily prevents a fair trial." Jammal v. Van de

27  Kamp, 926 F.2d 918, 920 (9th Cir.1991), quoting Kealohapauole v. Shimoda, 800 F.2d 1463, 1465

28  (9th Cir.1986).

1    Petitioner challenge to the trial court's ruling regarding the admission of Parraz's statements

2  under the California Evidence Code, it is not cognizable in this habeas proceeding.

3    In <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), the United States Supreme Court held that

4  the Confrontation Clause of the Sixth Amendment bars the state from introducing out-of-court

5  statements which are testimonial in nature, unless the witness is unavailable and the defendant had a

6  prior opportunity to cross-examine the declarant.  The Court categorically rejected, as inconsistent

7  with the Constitution, hearsay exceptions for statements deemed otherwise "reliable" despite the

8  absence of prior cross-examination:

9          [D]ispensing with confrontation because testimony is obviously reliable
           is akin to dispensing with a jury because a defendant is obviously
10         guilty.  This is not what the Sixth Amendment proscribes.

11 <u>Crawford</u>, 541 U.S. 62.

12   1.    <u>Retroactivity of Crawford Opinion</u>

13   In <u>Teague v. Lane</u>, 489 U.S. 288, 109 S.Ct. 1060 (1986), the Supreme Court held that "new

14 constitutional rules of criminal procedure will not be applicable to those cases which have become

15 final before the new rules are announced."  <u>Teague</u>, 489 U.S., at 310, 109 S.Ct., at 1075.  A new rule

16 is one which "breaks new ground or imposes a new obligation on the States or the Federal

17 Government;" in other words, a new rule is one where "the result was not dictated by precedent

18 existing at the time of the defendant's conviction became final."  <u>Teague</u>, 489 U.S. at 301, 109 S.Ct.

19 at 1070; <u>Snook v. Wood</u>, 89 F.3d 605, 612 (9th Cir. 1996).

20   A <u>Teague</u> analysis requires the Court to engage in a three step process.  First, the Court must

21 determine the date the petitioner's conviction became final.  <u>See Caspari v. Bohlen</u>, 510 U.S. 383,

22 390, 114 S.Ct. 948, 953-954 (1994); <u>Snook</u>, 89 F.3d at 612.  Second, the Court must survey the legal

23 landscape as it existed when the petitioner's conviction became final and determine whether a state

24 court considering the petitioner's claim at that time would have felt compelled by existing precedent

25 to conclude the new rule was required by Constitution.  <u>Caspari</u>, 510 U.S. at 390, 114 S.Ct., at 953;

26 <u>Saffle v. Parks</u>, 494 U.S. 484, 488 110 S.Ct. 1257, 1260 (1990).  Third, if the Court determines that

27 the petitioner seeks the benefit of new rule, the Court must consider whether the relief sought falls

28

14

1  within one of the two narrow exceptions to non-retroactivity.  See Gilmore v. Taylor, 508 U.S. 333,

2  345, 113 S.Ct. 2112, 2119 (1993).  The two narrow exceptions are (1) "the rule places a class of

3  private conduct beyond the power of the State to proscribe . . . or addresses a substantive categorical

4  guarante[e] accorded by the Constitution;" or (2) the rule announces a "watershed rule[ ] of criminal

5  procedure implicating the fundamental fairness and accuracy of the criminal proceeding."  Graham,

6  506 U.S. at 477-78, 113 S.Ct. 892, 903 (internal quotations omitted).  The first exception only applies

7  to rules that place certain private "individual conduct beyond the power of the criminal law-making

8  authority to proscribe." Teague, 489 U.S., at 307, 109 S.Ct., at 1073.  The second exception applies to

9  watershed rules, which are those rules that are "central to an accurate determination of innocence or

10 guilt." Teague, 489 U.S. at 313, 109 S.Ct. 1060.  Watershed rules of criminal procedure implicate

11 "the fundamental fairness and accuracy of the criminal proceeding," Saffle, 494 U.S., at 495, 110

12 S.Ct., at 1264;  Teague, 489 U.S. at 311, 109 S.Ct. at 1076, and are the small core of rules that require

13 procedures which are implicit in the concept of ordered liberty.  Graham, 506 U.S. at 478, 113 S.Ct.

14 at 903.

15     In the recent Ninth Circuit opinion of Bockting v. Bayer, 399 F.3d 1010 (9th Cir. 2005), the

16 Ninth Circuit held that Crawford applies retroactively.  There, the Court found the Crawford opinion

17 announced a new rule, but it fell under the second "watershed" exception to Teague.  Bockting, 399

18 F.3d at 1016-1021.  The Court found the Crawford rule to be procedural in nature and stated that it

19 warranted retroactive application only if it implicated "the fundamental fairness and accuracy of the

20 criminal proceedings."  Id. at 1016.  "That the Crawford requirement is fundamental to our legal

21 regime is beyond dispute."  Id.  By the Supreme Court's rejection of the judicially-administered

22 reliability test of Ohio v. Roberts, 448 U.S. 56 (1980)[2], Crawford altered "our understanding of the

23 bedrock procedural elements essential to the fairness of a proceedings."  Id. at 1019-1021; see also

24 Sawyer v. Smith, 497 U.S. 227, 242 (1990).

25     Alternatively, Justice Noonan joined the conclusion that Crawford applies retroactively, but

26

27     [2] Roberts had conditioned admissibility of hearsay evidence on whether it falls under a "firmly rooted hearsay
exception," or bears particularized guarantees of trustworthiness. See, Crawford, 541 U.S. at 60  (quoting Roberts, 448 U.S.

28 at 66.) Roberts thus permitted testimonial hearsay which would violate Crawford's bright-line Sixth Amendment standard.

1    articulated the alternative ground that it is not a "new rule" within the meaning of Teague.  This

2    conclusion is founded on the recognition that Crawford did not announce a new rule, but was rather a

3    correction of a misinterpretation of a prior rule.  Bockting, at 1023.  "A change in rationale is not

4    treated by the Supreme Court as a change in rules.  All along, the bedrock was there." Id. at 1024

5    (citing Crawford, 541 U.S. at 59.)  This was also the conclusion of the district court in Richardson v.

6    Newland, 342 F.Supp.2d 900 (E.D. Cal. 2004).

7        Applying either analysis, the bar on retroactive application of the Crawford opinion does not

8    apply.

9        2.    Application of Crawford to Petitioner's Claim

10       First, Parraz's statements were testimonial in nature.  As Petitioner submits Mr. Parraz was a

11   witness, a victim (of the arson), and an accomplice (in the drug trade), whose statements were made

12   to investigating officers during custodial interview.  (RT 479-480.)  Parraz was a witness and

13   accomplice, whose statements were "knowingly given in response to structured police questioning"

14   qualifies as testimonial "under any conceivable definition." Id. at 53, n. 4.  Thus, the statements

15   qualify as testimonial.  See, Crawford, 541 U.S. at 51.

16       Second, Petitioner never had the opportunity to cross-examine Parraz regarding the statements

17   that Detective Sumpter attributed to him, as the statements were made to him during custodial

18   interrogation.  Accordingly, Crawford bars admission of Parraz's statements.  Finding a Crawford bar,

19   the Court must next determine whether the error was harmless.

20       3.    Harmless Error

21       A Confrontation Clause violation is subject to harmless error analysis.  Bockting, 399 F.3d at

22   1022 (citing Neder v. United States, 527 U.S. 1, 15 (1999).)  Neder sets forth the harmless error

23   analysis under Chapman v. California, 386 U.S. 18 (1967).  Under this test, "before a federal

24   constitutional error can be harmless, the court must be able to declare a belief that it was harmless

25   beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24, (1967).

26       In Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986), the Supreme Court provided guidance

27   on the factors to consider when applying the Chapman standard to a Confrontation Clause violation.

28   "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were

16

1  fully realized, a reviewing court might nonetheless say that the error was harmless beyond a

2  reasonable doubt." Id.  This inquiry depends on many factors, including "the importance of the

3  witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or

4  absence of evidence corroborating or contradicting the witness on material points, the extent of cross-

5  examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Id.

6        On collateral review, this Court applies the standard set forth in Brecht v. Abrahamson, 507

7  U.S. 619, 113 S.Ct. 1710 (1993).  In Brecht, the U.S. Supreme Court substantially restricted state

8  prisoners' access to federal habeas relief by requiring a showing that the violation of a federally

9  guaranteed right had a "substantial and injurious effect or influence in determining the jury's verdict."

10 Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S.Ct. 1710, 1714 (1993) (quoting Kotteakos v. United

11 States, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946)).  In order for an error to have a "substantial

12 and injurious effect or influence," it must have "affected the verdict." O'Neal v. McAnnich, 513 U.S.

13 432, 115 S.Ct. 992, (1995).   Thus, if the evidence is not merely sufficient, but so powerful,

14 overwhelming, or cumulative that the error simply could not reasonably said to have substantially

15 swayed the jury's judgment, the error is not harmful.

16              a.    Threats Against Parraz

17       Detective Sumpter testified that Parraz stated Petitioner had threatened to burn Parraz's house

18 down in retaliation for the theft of methamphetamine, had admitted the arson to Parraz after the fact,

19 and had further threatened Parraz's life.  (RT 533-536.)  The trial court admitted the statement under

20 California Evidence Code section 1370, which makes admissible statements which narrate, describe,

21 or explain the infliction or threat of physical injury upon the declarant.  The Court of Appeal found no

22 error in the admission of this statement.  (Exhibit D, at 12-16, attached to Answer.)  This decision is

23 now contrary to the Supreme Court's decision in Crawford.[3]  Although the state court's determination

24 of this issue is contrary to Supreme Court precedent, the Court must nonetheless determine whether

25 the error was harmless.

26       Petitioner argues the error was not harmless.  Petitioner reasons that although there was

27 _____

28      [3] As the Crawford opinion was issued subsequent to the Court of Appeal's opinion it could not have envisioned its impact.

17

1  independent evidence of the existence of a dispute between Parraz and Gonzalez over drugs and

2  money, motive alone is insufficient circumstantial evidence to prove the crime.  "There was not a

3  scintilla of physical evidence linking Gonzalez to the arson."  (Petitioner's Supplemental Brief, at 10.)

4  (citing RT 411 (testimony of Capt. Weger, fire investigator).)

5        As Petitioner submits there was no physical evidence linking Petitioner to the arson.  No

6  witnesses testified in court that they personally heard Petitioner make threats of arson or take credit

7  for the fire after the fact.  Although Monica Rivera acknowledged that she told Detective Sumpter that

8  Jesse told her Petitioner had warned them to stay away from the house the night of the fire and that

9  was one of the reasons they stayed in a motel, she testified in open court that she was never threatened

10 or warned to stay away from her house.  (RT 418-419, 427-428.)  Her statement that Jesse had told

11 her that Petitioner informed him to stay away from the house, only served to reinforce Parraz's

12 statements to Detective Sumpter.

13       Absent the statements made by Parraz to Detective Sumpter, the only evidence linking

14 Petitioner to the arson came from Petitioner himself and Monica Rivera.[4]  During the interview with

15 Detective Lopez, Petitioner admitted that he phoned the men who were at Parraz's house and told

16 them to burn it.  (CT 592; RT 953.)  As the prosecutor acknowledged, Petitioner's admission alone is

17 insufficient to convict.  Further, as Petitioner submits he maintained throughout the interview that

18 Ruben Ventura had made the decision to burn the house(s), and had done so for his own reasons, and

19 thus the admission of approval would not support the prosecution's theory that Petitioner personally

20 caused the fire to retaliate for the theft of his methamphetamine.[5]  Although there was independent

21 evidence of the existence of a dispute between Parraz and Petitioner over drugs and money, motive

22 alone is insufficient circumstantial evidence to prove the crime.

23       However, regardless of whether there is sufficient evidence to support Petitioner's conviction,

24 given the significant weight placed upon Parraz's statement as argued to the jury by the prosecution,

25

26       [4] In its supplemental briefing, Respondent fails to address what effect Parraz's statements may have had on his arson charge.  (Respondent's Supp. Briefing, at 6.)

27       [5] During the interview, Petitioner indicated that the night before Parraz's house was burned, Petitioner took Ventura
28 to Parraz's home and Petitioner believed Ventura burned Parraz's house to send a message that Ventura wanted his money back.  (CT 484.)  Petitioner stated that Parraz stole $20,000 from Ventura.  (CT 458.)

1   the impact and importance of the statements was substantial.  It therefore cannot be said that the error

2   was harmless beyond a reasonable doubt.  As Petitioner points out, in closing argument the prosecutor

3   emphasized the significance of Parraz's statements, explaining that the interview with Parraz had

4   enabled detectives to put together the "piece[s] of the puzzle."  She urged jurors "to find the *testimony*

5   *of Jesse Parraz and his wife Monica Rivera to be truthful.*"  (RT 937) (emphasis added.)  She

6   reasoned that, "What they're telling law enforcement is truthful."  (RT 937.)  By emphasizing the

7   significance of the statements and characterizing them as "testimony," the prosecutor inverted the

8   reliability analysis required by the Confrontation Clause.  As Petitioner argues, the prosecutor made

9   repeated reference to "the story given by Jesse Parraz, by Monica Rivera," as if the two sources had

10  provided a uniform account.  (RT 941, 944.)  However, the story came from testimony of Detective

11  Sumpter of which Rivera did not corroborate.  Rivera expressly denied that Petitioner had

12  communicated any threats to her or admitted to the arson.[6]  (RT 419, 421-422.)

13         Parraz's statement linking Petitioner to the arson was so significant that the error could have

14  materially affected the verdict, and it therefore cannot be said that its admission was not harmless

15  beyond a reasonable doubt.  The state court's determination of this issue was an objectively

16  unreasonable application of <u>Chapman</u>, in that no consideration as to the impact the statement may

17  have had on the jury was considered.  Further, given the significant weight placed upon Parraz's

18  statement as presented to the jury and lack of other evidence linking Petitioner to the arson, it simply

19  cannot be said that the statement did not have a substantial and injurious impact on the jury's verdict.

20  Because <u>Crawford</u> barred the admission of Parraz's statement and because its admission was not

21  harmless, Petitioner's petition for writ of habeas corpus must be GRANTED as to this claim.

22              b.    <u>Parraz's Statements Regarding Petitioner's Admission of Drug Dealing</u>

23         At trial, Detective Sumpter testified that Parraz stated that he had sold Petitioner materials for

24  manufacturing methamphetamine and that he had stolen methamphetamine from Petitioner two days

25  prior to the arson.  (RT 528-532.)  The Court of Appeal found that the trial court erred in admitting

26

27  ─────────────

28         [6]  Rivera did acknowledge that she told Detective Sumpter that she received threats from Petitioner, she claimed however that she only knew of it because her husband told her.  (RT 427.)

1  Parraz's statements regarding Petitioner's involvement in the drug dealing.[7] The admission of this

2  statement was in violation of <u>Crawford</u> as Petitioner did not have the prior opportunity to cross-

3  examine Parraz regarding the statement.  Thus, for reasons other than stated by the Court of Appeal,

4  the admission was error.

5         Finding the error to be harmless, the Court of Appeal held:

6         Though the introduction of Parraz's statements against penal interest that also
          inculpated [Petitioner] was error, we find that the weight of properly admitted
7         evidence to the same effect indicates that this error was harmless beyond a reasonable
          doubt.  Parraz's inadmissible statements indicated that [Petitioner] had participated in
8         the manufacture of methamphetamine and that he threatened to burn down Parraz's
          home.  [Petitioner] himself admitted to police that he was employed in arranging sale
9         of ephedrine for the manufacture of methamphetamine and that he told others to burn
          Parraz's home.  Haro and Alvarez testified about [Petitioner's] ownership of
10        methamphetamine and of its theft by Parraz, which was the motive for the burning of
          Parraz's home.  Rivera testified regarding [Petitioner's] warning to stay away from
11        Parraz's home on the night of the fire.  Materials commonly used for the manufacture
          of methamphetamine were found at both of [Petitioner's] residences, as were the
12        phone numbers of the coconspirators who testified against him.  Thus, all facts
          contained in Parraz's improper testimony were firmly established by persuasive,
13        admissible evidence.  Admission of Parraz's testimony was therefore harmless beyond
          a reasonable doubt.

14  (Exhibit D, at 16-17, attached to Answer.)

15

16         After reviewing the record in this case, the Court finds that Parraz's statements were not a

17  crucial piece of evidence in support of Petitioner's drug convictions.

18         With regard to Petitioner's conviction for conspiracy to manufacture methamphetamine, the

19  statement by Parraz implicating Petitioner in the manufacturing of methamphetamine was of little

20  significance.  As the Court of Appeal acknowledged, Petitioner himself admitted to police that he was

21  employed in arranging sales of ephedrine for the manufacture of methamphetamine.  (CT 442-444.)

22  The conspiracy to manufacture methamphetamine was established through the testimony of several

23  witnesses.  Lauro Haro testified that he stored the methamphetamine for Petitioner.  (RT 646-649.)

24  Three men went to the residence and stole the drugs that Petitioner asked Haro to hold.  (RT 649-

25  658.)  Alfredo Corpus supplied the pseudoephedrine tablets and chemicals to manufacture the

26  methamphetamine.  (CT 444, RT 568-578, 620-628.)  In fact, Detective Lopez intercepted a telephone

27

28         [7]  The Court of Appeal found that the admission of this statement did not bear sufficient indicia of reliability for
       admission as a statement against penal interest.  (Exhibit D, at 16, attached to Answer.)

1  call from Mr. Corpus and arranged a meeting with Mr. Corpus for the sale of the pseudoephedrine

2  tablets.  (RT 572-578.)  There was testimony establishing that Jose and Gaby also supplied chemicals

3  and pseudoephedrine and were charged with burning down Petitioner's family home.  (RT 447, 531,

4  580, 838, 845.)  Monica Rivera, testified that Jesse told her that he went to Terra Bella to steal some

5  methamphetamine, with Gaby and Jose.  (RT 445-448.)  Rivera testified that Jesse had mentioned that

6  he or somebody else had stole drugs from Petitioner and Petitioner was upset.  (RT 454.)  It was

7  worth a lot of money.  (Id.)  Rivera admitted that she told police that Petitioner owned the meth lap

8  equipment and that Petitioner and Jesse were engaged in a partnership to manufacture

9  methamphetamine.  (RT 466-467.)

10       In addition, multiple drug paraphernalia items were recovered from Petitioner's girlfriend's

11  residence and his family's residence, of which he resided.  At Petitioner's girlfriend's house, the

12  police found pay/owe sheets, a receipt for 10 gallons of denatured alcohol, a bag of creatine, a card

13  describing MSM, and a list of names and telephone numbers.  (RT 553-568.)  Mr. Corpus's name and

14  telephone appeared on the list.  (RT 564.)  With reference to the pay/owe sheets, it was established

15  that it contained a reference to the weight of drugs given to an individual in exchange for monetary

16  value. (RT 555-556.)  Detective Lopez testified that it is very common for individuals who traffic in

17  methamphetamine to keep track of what they give or what is owed to them on the pay/owe sheets,

18  much like an accountant would.  (RT 555-557.)  Detective Lopez testified that denatured alcohol is

19  used in the manufacturing of methamphetamine, often times it is a solvent in which ephedrine is

20  extracted from pseudoephedrine tablets.[8]  (RT 559.)  Lopez testified that MSM is the most common

21  diluting agent used in manufacturing of methamphetamine.  (RT 565.)  It is a filler or a cutting agent

22  to extend an amount of pure methamphetamine to a greater degree.  (RT 566.)  Petitioner admitted

23  that the white powdery substance found underneath one of the kitchen cabinets was creatine.  (RT

24  566.)  It too is used as a cutting or diluting agent.  (Id.)

25       At Petitioner's residence, police found more pay/owe sheets, lye, and a breathing apparatus.

[8] Detective Lopez further testified that Ephedrine is a precursor for the manufacturing of methamphetamine.  (RT 559-560.)  Lopez testified that pseudoephedrine tables are combined with a solvent such as denatured alcohol to extract the ephedrine from the tablets.  (RT 561.)

21

1   (RT 804-812.)  Officer Diaz testified that individuals who deal and manufacture methamphetamine

2   use breathing appartuses to keep from ingesting the fumes and chemicals.  (RT 809-810.)

3          In light of the lack of emphasize given to Parraz's statements implicating Petitioner in the

4   drug charges, the Court of Appeal's application of <u>Chapman</u> was not unreasonable and it cannot be

5   said that the admission of Parraz's statement implicating Petitioner in the drug transaction had a

6   substantial and injurious influence on the jury's verdict. <u>Brecht</u>, 507 U.S. at 623, 114 S.Ct. at 1714.

7   Accordingly, Petitioner is not entitled to habeas relief.

8   E.     <u>Sufficiency of Evidence to Support Conviction for Attempt to Possess Pseudoephedrine</u>

9          Petitioner contends that there was insufficient evidence to support the conviction of

10  attempt to possess pseudoephedrine with intent to manufacture methamphetamine.  Specifically,

11  Petitioner argues that he did not commit any part of the actus reas of the offense of possession of the

12  substance.  Petitioner argues that instead the evidence shows that he did nothing more than establish

13  contact with a drug supplier, with the intent of engaging in a future transaction.

14         The law on insufficiency of the evidence claim is clearly established.  The United States

15  Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a

16  federal court must determine whether, viewing the evidence and the inferences to be drawn from it in

17  the light most favorable to the prosecution, any rational trier of fact could find the essential elements

18  of the crime beyond a reasonable doubt.  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  Sufficiency

19  claims are judged by the elements defined by state law.  <u>Id</u>. at 324, n. 16.

20         In denying Petitioner's claim on direct appeal, the Court of Appeal held:

21             [Petitioner's] guilt of the contested charge was established by the acts of
        Corpus in furtherance of gathering the chemicals necessary to manufacture
22      methamphetamine.  The jury found [Petitioner] guilty of conspiracy to manufacture
        methamphetamine together with Corpus and others. [Petitioner] does not contest the
23      sufficiency of evidence of his guilt of conspiracy. [Petitioner's] possession of other
        ingredients and equipment of the manufacture of methamphetamine plus the
24      statements of [Petitioner] and his coconspirators regarding the structure of the
        conspiracy demonstrate the existence of as well as [Petitioner's] active participation in
25      this plan. [Petitioner] is thus liable for Corpus's actions of procurring the
        pseudoephedrine in furtherance of their drug manufacturing conspiracy.
26
    (Exhibit D, attached to Answer, at 18.)
27
           "Every person who attempts to commit, but fails, or is prevented or intercepted in its
28

22

1 perpetration, shall be punished . . . ." Ca. Penal Code § 664.  Attempt to commit a crime consists of a

2 specific intent to commit the crime and a direct but ineffectual act done towards its commission.

3 People v. Jones, 75 Cal.App.4th 616, 617 (1999).  The act must extend beyond mere preparation and

4 must be a direct movement after preparation that would accomplish the crime but for extraneous

5 circumstances.  People v. Carpenter, 15 Cal.4th 312, 387 (1997).  Conspirators are liable for each act

6 of another member of the group in furtherance of the conspiracy.  (CALJIC No. 6.11.)   Liability

7 extends not only to actions that are explicitly planned, but also to acts that are reasonably foreseeable

8 in furtherance of the common goals.  People v. Hardy, 2 Cal.4th 86, 188 (1992); People v. Croy, 41

9 Cal.3d 1, 12, fn. 5 (1985).

10        Sufficient evidence supported Petitioner's conviction for attempt to possess pseudoephedrine

11 with the intent to manufacture methamphetamine.  At trial, Detective Lopez testified that Mr. Corpus,

12 Petitioner's accomplice, delivered a large quantity of pseudoephedrine, a precursor required for the

13 manufacture of methamphetamine, to Detective Lopez, thinking he was Petitioner.  (RT 572-578.)

14 The delivery followed a phone call from Mr. Corpus to Petitioner in which Detective Lopez answered

15 the phone, pretending to be Petitioner.  (RT 568-569.)  Mr. Corpus spoke to Detective Lopez in code

16 to arrange for the delivery of the pseudoephedrine.  (RT 569-571.)  It appeared that Mr. Corpus and

17 Petitioner had previously arranged for this transaction.  (RT 571-572.)  As Respondent submits, it

18 may reasonably be inferred from the episode that Petitioner told Mr. Corpus that he would purchase

19 pseudoephedrine from him, and that they had advanced these negotiations to the point that only a

20 delivery location, time and date, needed to be established.  When Detective Lopez agreed to a meeting

21 place, Mr. Corpus appeared with the previously agreed upon chemicals.  Since Petitioner and Mr.

22 Corpus were coconspirators and Petitioner had done all but receive the pseudoephedrine from Mr.

23 Corpus, the evidence was sufficient to support Petitioner's conviction for attempt to possess

24 pseudoephedrine with intent to manufacture methamphetamine.

25        Further and of significant weight, the evidence found at Petitioner's girlfriend's home and his

26 family's residence, support his conviction for attempt to possess pseudoephedrine with the intent to

27 manufacture methamphetamine.  At Petitioner's girlfriend's house, the police found pay/owe sheets, a

28 receipt for 10 gallons of denatured alcohol, a bag of creatine, a card describing MSM, and a list of

1  names and telephone numbers.  (RT 553-568.)  Mr. Corpus's name and telephone appeared on the

2  list.  (RT 564.)  With reference to the pay/owe sheets, it was established that it contained a reference

3  to the weight of drugs given to an individual in exchange for monetary value. (RT 555-556.)

4       Testimonial evidence demonstrates the evidence found at the residences supports a finding

5  that Petitioner was involved in drug trafficking.  Detective Lopez testified that it is very common for

6  individuals who traffic in methamphetamine to keep track of what they give or what is owed to them

7  on the pay/owe sheets, much like an accountant would.  (RT 555-557.)  Detective Lopez testified that

8  denatured alcohol is used in the manufacturing of methamphetamine, often times it is a solvent in

9  which ephedrine is extracted from pseudoephedrine tablets.[9]  (RT 559.)  Lopez testified that MSM is

10  the most common diluting agent used in the manufacturing of methamphetamine.  (RT 565.)  It is a

11  filler or a cutting agent to extend an amount of pure methamphetamine to a greater degree.  (RT 566.)

12  Petitioner admitted that the white powdery substance found underneath one of the kitchen cabinets

13  was creatine.  (RT 566.)  It too is used as a cutting or diluting agent.  (Id.)

14       At Petitioner's residence, police found more pay/owe sheets, lye, and a breathing apparatus.

15  (RT 804-812.)  Officer Diaz testified that individuals who deal and manufacture methamphetamine

16  use breathing appartuses to keep from ingesting the fumes and chemicals.  (RT 809-810.)

17       Viewing the evidence in the light most favorable to the prosecution, a reasonable juror could

18  have found Petitioner guilty of attempt to possess pseudoephedrine with intent to manufacture

19  methamphetamine.  The state courts' determination of this issue was not contrary to, or an

20  unreasonable application of, clearly established Supreme Court precedent.

21  <u>RECOMMENDATION</u>

22  Based on the foregoing, it is HEREBY RECOMMENDED that:

23  1.    The petition for writ of habeas corpus be GRANTED as to Petitioner's second claim

24      regarding the admission of the out of court statement implicating Petitioner in the

25      arson conviction, subject to the State's right to retry Petitioner;

26

27    [9] Detective Lopez further testified that Ephedrine is a precursor for the manufacturing of methamphetamine. (RT

28  559-560.) Lopez testified that pseudoephedrine tables are combined with a solvent such as denatured alcohol to extract the ephedrine from the tablets. (RT 561.)

2.      The remaining claims in the petition for writ of habeas corpus be DENIED; and

3.      If this recommendation is adopted, the State must, within ninety (90) days from the date of service of the District Judge's order, inform the Court whether it will retry Petitioner on the arson charge.

These Findings and Recommendations are submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:    July 25, 2005                      /s/ Dennis L. Beck
3b142a                                UNITED STATES MAGISTRATE JUDGE