# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM GONZALEZ, | 1:03–cv-5695 OWW DLB HC |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS FOLLOWING REMAND FROM NINTH CIRCUIT COURT OF APPEALS |
| v. | |
| JIM HAMLET, Warden, | |
| Respondent. | [Doc. 1] |
| _____/ | |

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## PROCEDURAL BACKGROUND AND HISTORY

Petitioner filed the instant petition for writ of habeas corpus on May 27, 2003. Respondent filed an answer to the petition on September 23, 2003, and Petitioner filed a traverse on November 17, 2003. (Court Docs. 7, 10.) On December 6, 2004, the Court appointed the Office of the Federal Defender to represent Petitioner, and directed supplemental briefing in light of the Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004). (Court Doc. 12.) Respondent filed a supplement on January 3, 2005, and Petitioner filed his supplemental brief on March 3, 2005. (Court Docs. 15, 19.) On July 26, 2005, the Court issued a Findings and Recommendation recommending that the petition be granted as to Petitioner's Crawford claim, and denied with respect to all other claims. (Court Doc. 21.) After filing of objections, the Recommendation was adopted in full on November 16, 2005, and the petition was granted in part

1

1   and denied in part.  (Court Doc. 25.)

2         Respondent filed a notice of appeal on December 8, 2005.  (Court Doc. 26.)  On April 3,

3   2007, the Ninth Circuit Court of Appeals reversed and remanded in light of the Supreme Court's

4   opinion Whorton v. Bockting, 127 S.Ct. 1173 (2007), which overruled its prior opinion in

5   Bockting v. Bayer, 399 F.3d 1010 (9th Cir. 2005), holding that the Crawford rule does not apply

6   retroactively to cases, such as the instant one, that are on collateral review.  (Court Doc. 34,

7   Unpublished Opinion, at 2.)  The case was remanded for reconsideration of the claim applying

8   pre-Crawford principles.  (Id.)

9         On January 4, 2008, the Court issued an order informing the parties that further briefing

10  was not necessary, as the petition was fully briefed on the merits applying pre-Crawford

11  principles.  (Court Doc. 35.)

12        At the outset the Court clarifies that the instant recommendation is limited to re-analyzing

13  Petitioner's second claim regarding the admission of Parraz's statement of Petitioner's threat, as

14  all the other claims were denied on the merits, and remain final rulings as no appeal was taken as

15  to those issues.  (See Unpublished Opinion, at 1.)

16                          STATEMENT OF FACTS[1]

17  Trial Testimony

18  Captain Michael Weger, an investigator with the California Department of Forestry and

19  Fire Protection and Tulare County Fire Department, testified that he investigated a fire at 24565

20  Avenue 82 near Terra Bella in Tulare County.  (RT 341-343.)  There were two residences on the

21  property that had been burnt to the ground and an unattached garage sustained major damage.

22  (RT 343.)  Mr. Weger concluded that the fire in the two residences was caused by arson because

23  there were multiple points of origin, none near any potential causes for an accidental fire, such as

24  electrical wiring or a gas outlet.  (RT 350.)  It was not possible to determine if there was

25  evidence, such as a pour pattern, of use of an accelerant to start the fire.  (RT 410.)  Mr. Weger

26  concluded that the fire in the garage started because it was near the burning residences.  (RT 352-

27

28        [1] The Court incorporates the statement of facts as set forth in the prior Findings and Recommendation,
    issued July 26, 2005.  (Court Doc. 21.)

353.)

It was concluded that the fire in the other residence began where a flammable liquid had been poured on the floor. (RT 354.) A plastic gasoline can was found nearby. (RT 355.) Mr. Weger was of the opinion that the fire was started by arson. (RT 362.)

There were two vehicles on the premises registered to Jesse Parraz and mail addressed to him was found in the mailbox. (RT 360-361.)

On August 13, 1999, Mr. Weger was requested by the Visalia Police Department to investigate a fire bombing at Petitioner's family residence. (RT 363-364.) A pipe bomb was discovered on the floor of the residence. (RT 364.) Petitioner told Mr. Weger that he had cheated Jesse Parraz in a drug deal, and that Parraz told him to burn down his home so he could get the insurance money, and Parraz had hired someone to burn Petitioner's home to retaliate against him if he did not burn Parraz's house. (RT 365-367.) Later that day, Mr. Weger received a phone call from Detective Lopez indicating that Parraz was in custody for selling methamphetamine and that Parraz stole drugs from Petitioner, and that Parraz thought that Petitioner burned Parraz's house. Detective Lopez advised Weger to cease the investigation of insurance fraud. (RT 387-392.)

Monica Rivera, Jesse Parraz's wife, testified that she married Jesse in 1999, and resided at the home that was burned on August 12, 1999. The night it was burned she and her family stayed at a motel because she had a doctor's appointment the next morning. (RT 418-419.) She testified that she had never been threatened or warned to stay away from her house. (RT 418-419.) Ms. Rivera met Petitioner through her husband and regarded him as a friend. (RT 420.) She indicated that she talked to Petitioner approximately twice a week. (RT 441.) Although Ms. Rivera spoke with Petitioner the day before the fire occurred, she could not recall the contents of that conversation. (RT 422.)

Subsequent to the fire, Ms. Rivera and Jesse Parraz were arrested in Visalia by Detective Corey Sumpter. (RT 426.) Police found a quarter pound of "dope" during the search. (RT 449-450.)

Ms. Rivera admitted telling Detective Sumpter that Jesse told her Petitioner had warned

them to stay away from the house the night of the fire.  (RT 427.)  She admitted that was one of the reasons why they stayed in a motel that night.  (RT 428.)  She testified that Petitioner said he was sorry, but she could not remember if Petitioner told her he caused the fire and at trial she did not believe he had.  (RT 430-433.)

Ms. Rivera was aware that methamphetamine was being manufactured in the smaller residence at her home; however, she never observed it.  (RT 450-452.)  Jesse and Petitioner were partners in the manufacturing of methamphetamine.  (RT 467.)

Jesse told Rivera that he did not plant the pipe bomb at Petitioner's residence.  However, Jesse told her that he had been arrested for it, along with Gaby (later identified as Gabriel Alvarez) and Jose (later identified as Jose Mendez).  (RT 446-447, 580.)  Jesse told her that he stole ten pounds of methamphetamine from Petitioner because he owed him money.  (RT 445, 458-459.)

After Rivera was released from jail she talked to Detective Lopez about trying to locate a boxed methamphetamine laboratory, which was owned by Petitioner.  (RT 465-466.)

Detective Sumpter, of the Visalia Police Department, arrested both Parraz and Rivera for selling methamphetamine on August 12, 1999.  (RT 478.)  Sumpter testified that Rivera told him that Petitioner had burned her house and had warned her that it would be burned.  (RT 478-482.)

Parraz told Sumpter that he worked with Petitioner manufacturing methamphetamine and that he supplied Petitioner with chemicals in exchange for methamphetamine and money.  Petitioner owed Parraz $24,000, and the two had a falling out because Petitioner failed to pay the money.  (RT 528-529.)  Jose and Gaby also supplied Petitioner with pseudoephedrine.  (RT 531.)

Parraz told Sumpter that he had stolen the quarter pound of methamphetamine found in his possession at the time of his arrest from Petitioner.  (RT 528.)  Parraz admitted that on August 10, 1999, he, along with Jose and Gaby, stole several pounds of methamphetamine from Lauro Haro's residence, who was storing the methamphetamine for Petitioner.  (RT 530-531.)

Parraz claimed that Petitioner was angry because he had taken his methamphetamine.  Petitioner told Parraz that he would burn his house.  (RT 533-534.)  After the house was burned, Petitioner admitted to Parraz that he had done it in retaliation and Parraz said he would burn his

4

1   house in return.  (RT 535-536.)

2        Parraz had previously worked with the Visalia Police Department as an informant.  (RT

3   487.)  As a result of this drug transaction, multiple individuals were arrested.  (RT 516.)

4        <u>Detective Mark Lopez</u>, with the Visalia Police Department, executed a search warrant on

5   September 1, 1999, at the Porterville apartment Petitioner occupied with his girlfriend.  (RT

6   548.)  Several items were seized including pay/owe sheets, plastic wrap, a receipt for denatured

7   alcohol, a list of phone numbers and names, a card describing MSM which is a diluting agent,

8   and a bag of creatine which is a cutting agent.  (RT 548-566.)  All of which are consistent with

9   the manufacturing of methamphetamine.  (<u>Id</u>.)

10       While Detective Lopez was at the residence, Petitioner's cell phone rang and pursuant to

11  the search warrant Lopez answered it pretending to be Petitioner.  (RT 568.)  The other party

12  identified himself as "Contratista" (later identified as Alfredo Corpus) and offered to provide

13  Petitioner with 40 nectarines.  (RT 569.)  A meeting was set up.  (<u>Id</u>.)  As Detective Lopez

14  believed the caller was speaking in code terms, Petitioner acknowledged the transaction was

15  about "bud."  (RT 572.)  After several more phone calls Lopez met Corpus in the parking lot of a

16  Shell station where Corpus appeared with pseudoephedrine tablets in his vehicle and he was

17  arrested.  (RT 576-578.)

18       One of the phone numbers contained in the phone list obtained from Petitioner's bedroom

19  at his girlfriend's apartment belonged to Gabriel Alvarez.  Police located Alvarez, who told

20  Detective Lopez that he was involved in manufacturing methamphetamine and supplying

21  chemicals.  Alvarez said that he, Parraz and a third individual stole nine pounds of

22  methamphetamine from Petitioner that was stashed at Haro's house.  (RT 580.)

23       On September 1, 1999, Lopez interviewed Petitioner at the Visalia Police Department.  A

24  videotaped statement of the interview was shown to the jury.  (RT 603, 604, 614, 802.)

25       On September 2, 1999, Lopez went to Haro's house in Tonyville and obtained his consent

26  to search the residence.  Haro admitted that he held methamphetamine for Petitioner.  Haro

27  admitted that Parraz, Gaby and Jose had taken 8-10 pounds of methamphetamine from him at

28  gunpoint.  (RT 581-583.)

On September 1, 2000, Petitioner was interviewed by Detective Lopez at the Visalia Police Department, Petitioner was advised and waived his Miranda rights.  (CT 436.)

Petitioner admitted that he knew people who sold ephedrine.  (CT 442.)  Petitioner indicated that Alfredo Corpus was bringing ephedrine to him, and that he was going to give it to somebody else or put Corpus together with another person.  (CT 444.)

Petitioner introduced Parraz to Ruben Ventura, and Parraz stole $20,000 from Ventura.  (CT 458.)  The night before Parraz's house burned, Petitioner took Ventura to Parraz's home and he believed Ventura was going to steal from the home.  (CT 462-462, 467.)  Petitioner told Rivera not to go to her house.  (CT 471.)  Petitioner believed that Ventura burned Parraz's house to send a message that Ventura wanted his money back.  (CT 484.)

Petitioner told Detective Lopez that he knew the pipe bomb came from Parraz.  (CT 442.)  Petitioner believed that a methamphetamine user from Visalia made the bomb.  (CT 559.)  Petitioner said he would kill Parraz if he could, and that he would get to Parraz in prison.  (CT 491.)

Petitioner admitted that he lied when he told Officer Camacho that Parraz's home was burned for insurance purposes.  (CT 499.)

Petitioner claimed to owe Parraz $2,000 for a BMW automobile.  (CT 505.)

Petitioner told Lopez that the night before Parraz's house burned, he and Parraz were supposed to meet at a Taco Bell at Mary's Vineyard.  When Parraz did not arrive, Petitioner phoned Ventura and the other men who were at Parraz's house and told them to burn it.  (CT 592.)

Petitioner acknowledged Lauro Haro's house was used as a "stash" house.  He acknowledged the theft of methamphetamine occurred the day before Parraz's house burned.  (CT 638.)  Approximately ten pounds of methamphetamine were taken.  (CT 640.)  Lauro told Petitioner that Parraz, Gaby and Jose, took it.  (CT 644.)  Petitioner claimed the X-Men, who cooked the methamphetamine, owned it.  (CT 652-653.)

Petitioner told Detective Lopez that Parraz admitted to stealing the methamphetamine and had agreed to return it to him at a meeting at Taco Bell.  (CT 659.)  When Parraz did not show

6

1    up, the X-men burned Parraz's house.  (CT 664.)

2         Petitioner admitted that he sold dope because it was easy money.  (CT 668.)

3         Officer Gerdes, of the Visalia Police Department, testified that he assisted in the search of

4    Petitioner's girlfriend's apartment in Porterville and arrest of Mr. Corpus.  He recovered a paper

5    from Corpus's wallet with Petitioner's phone number on it, and found several hundred loose

6    tablets and bottles of pseudoephedrine.  (RT 620-628.)  He indicated that pseudoephedrine is a

7    nasal decongestant that can be mixed with denatured alcohol and heated in order to extract

8    ephedrine, as part of the process of manufacturing methamphetamine.  (RT 629-634.)

9         Lauro Haro, testified that he met Petitioner in August of 1999, and indicated that

10   Petitioner asked him to store methamphetamine.  (RT 647, 688.)  Haro picked up a quantity of

11   methamphetamine from a residence in Terra Bella and took it to his residence in Lindsay and

12   stored it.  (RT 648.)  Petitioner gave Haro a pound of methamphetamine in return for his service.

13   (RT 649.)  A couple weeks before September 2, 1999, three other men came to his house, and

14   took the methamphetamine at gunpoint.  (RT 651-657.)  Haro told Petitioner that his friends had

15   taken the methamphetamine.  (RT 658.)

16        Mark Kalchik, a criminalist for the California Department of Justice, examined the tablets

17   found in Corpus's vehicle and confirmed that they contained pseudoephedrine.  (RT 788, 794.)

18        Officer Jerry Diaz, of the Woodlake Police Department, assisted in the search of

19   Petitioner's family residence in Woodlake, where he confiscated more pay/owe sheets, lye, and a

20   breathing apparatus.  (RT 804-806.)

21        Ann Kromberg, of the Drug Enforcement Agency, testified that it is illegal to sell more

22   than 30 grams of pseudoephedrine.  (RT 834.)  Kromberg arranged for the subpoena of telephone

23   records and residences of Gaby and Jose.  Gaby was interviewed on September 23, 1999, and

24   Jose was interviewed on September 28, 1999.  (RT 856.)  Jose told Kromberg that he supplied

25   chemicals to manufacture methamphetamine.  (RT 838, 845.)  She testified that the method of

26   manufacture used in this case was called the Mexican cook or pseudoephedrine red phosphorus

27   method.  (RT 853.)

28   ///

1    DISCUSSION

2    A.    Jurisdiction

3    Relief by way of a petition for writ of habeas corpus extends to a person in custody

4    pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

5    or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

6    529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

7    violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

8    out of the Tulare County Superior Court, which is located within the jurisdiction of this Court.

9    28 U.S.C. § 2254(a); 2241(d).

10    On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

11    of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

12    enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), cert. denied, 522 U.S.

13    1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting

14    Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct.

15    1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

16    (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

17    petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

18    B.    Standard of Review

19    This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

20    custody pursuant to the judgment of a State court only on the ground that he is in custody in

21    violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

22    The AEDPA altered the standard of review that a federal habeas court must apply with

23    respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v.

24    Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus

25    will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

26    to, or involved an unreasonable application of, clearly established Federal law, as determined by

27    the Supreme Court of the United States;" or "resulted in a decision that was based on an

28    unreasonable determination of the facts in light of the evidence presented in the State Court

8

1  proceeding." 28 U.S.C. § 2254(d); <u>Lockyer v. Andrade</u>,123 S.Ct.1166 (2003) (disapproving of

2  the Ninth Circuit's approach in <u>Van Tran v. Lindsey</u>, 212 F.3d 1143 (9th Cir. 2000)); <u>Williams v.</u>

3  <u>Taylor</u>, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply

4  because that court concludes in its independent judgment that the relevant state-court decision

5  applied clearly established federal law erroneously or incorrectly."  <u>Lockyer</u>, at 1175 (citations

6  omitted).  "Rather, that application must be objectively unreasonable."  <u>Id.</u> (citations omitted).

7       While habeas corpus relief is an important instrument to assure that individuals are

8  constitutionally protected, <u>Barefoot v. Estelle</u>, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392

9  (1983); <u>Harris v. Nelson</u>, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a

10  criminal conviction is the primary method for a petitioner to challenge that conviction.  <u>Brecht v.</u>

11  <u>Abrahamson</u>, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's

12  factual determinations must be presumed correct, and the federal court must accept all factual

13  findings made by the state court unless the petitioner can rebut "the presumption of correctness

14  by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); <u>Purkett v. Elem</u>, 514 U.S. 765, 115

15  S.Ct. 1769 (1995); <u>Thompson v. Keohane</u>, 516 U.S. 99, 116 S.Ct. 457 (1995); <u>Langford v. Day</u>,

16  110 F.3d 1380, 1388 (9th Cir. 1997).

17  C.    <u>Parraz's Out of Court Statements Regarding Petitioner's Threat</u>

18  _____Petitioner contends that the admission of Parraz's out of court statement that Petitioner

19  threatened to burn down Parraz's house was inadmissible hearsay.  Petitioner further contends

20  that Parraz's out of court statements implicating him in the manufacture and sale of

21  methamphetamine, were improperly admitted and constituted prejudicial error.

22       The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal

23  prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against

24  him."  U.S. Const. am. VI.  In <u>Ohio v. Roberts</u>, 448 U.S. 56 (1980), the Supreme Court set forth

25  the requirements for admission of a hearsay statement in a criminal trial when the declarant is

26  unavailable, consistent with the requirements of the Confrontation Clause.  The Court explained

27  that such a statement "is admissible only if it bears adequate 'indicia of reliability.'"  <u>Id</u>. at 66;

28  <u>Hernandez v. Small</u>, 282 F.3d 1132, 1137 (9th Cir. 2002).  Adequate reliability, the Court

1  continued, can be demonstrated in one of two ways.  First, "[r]eliability can be inferred without

2  more in a case where the evidence falls within a firmly rooted hearsay exception."  Id.  Second, if

3  the evidence does not fall within a firmly rooted exception, it may be admitted if there is a

4  sufficient "showing of particularized guarantees of trustworthiness."  Id.; Hernandez, 282 F.3d at

5  1137.

6       The determination of whether Parraz's statement was "sufficiently reliable to be admitted

7  without violating [Roberts] is a mixed question" of law and fact.  Swan v. Peterson, 6 F.3d 1373,

8  1379 (9th Cir. 1993).   Reliability may be "inferred without more" where the statements fall

9  within a firmly rooted hearsay exception.  Idaho v. Wright, 497 U.S. 805, 815 (1990).  Reliability

10  is to be judged by a review of the totality of the circumstances that "surround the making of the

11  statement and that render the declarant particularly worthy of belief."  Id. at 820.  California

12  Evidence Code section 1370 limits admittance of hearsay statements to "circumstances that

13  would indicate its truthworthiness."  Cal. Evid. Code § 1370, subd. (4).[2]

14       On collateral review, this Court's review is limited to whether the state courts'

15  adjudication of this claim "was contrary to, or involved an unreasonable application of, clearly

16  established Federal law, as determined by the Supreme Court of the United States" 28 U.S.C. §

17  2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence

18  presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

19       Petitioner presented this claim to the California Court of Appeal, Fifth Appellate District

20  and California Supreme Court.  Because the California Supreme Court's opinion is summary in

21

22       [2] California Evidence Code, section 1370 states:
23            (a) Evidence of a statement by a declarant is not made inadmissible by the hearsay rule if
        all of the following conditions are met:
24            (1) The statement purports to narrate, describe, or explain the infliction or threat of
        physical injury upon the declarant.
25            (2) The declarant is unavailable as a witness pursuant to section 240.
            (3) The statement was made at or near the time of the infliction or threat of physical
26       injury. Evidence of statements made more than five years before the filing of the current action or
        proceeding shall be inadmissible under this section.
27            (4) The statement was made under circumstances that would indicate its trustworthiness.
            (5) The Statement was made in writing, was electronically recorded, or made to a
28       physician, nurse, paramedic, or to a law enforcement official.

nature, however, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

Prior to trial, Mr. Parraz invoked his Fifth Amendment right not to testify and incriminate himself at Petitioner's trial. (RT 99.) The court found that Mr. Parraz was unavailable within the meaning of the Evidence Code. (Id.) The court allowed the statements by Parraz to come in through the Detectives that interviewed him. Specifically, the court ruled that Parraz's statement that Petitioner had threatened to burn Parraz's house was admissible as a threat of injury. (CT 266-268; RT 19, 238-240.)

The Fifth District Court of Appeal properly found that Parraz was unavailable as a witness because he invoked his Fifth Amendment privilege not to testify. The Court of Appeal's findings of facts are not unreasonable in light of the evidence in the record. The Court of Appeal found that the threat was issued on or about August 11, and the fire took place over the night of the 11th through 12th. (RT 534.) Parraz's statement of the threat was recorded by Detective Sumpter who testified to the circumstances surrounding the taking of the statement. (RT 527-537.) The reliability of Parraz's statement is strengthened by the fact that it was reported relatively soon after they were made, and as found by the state court before Parraz knew that his house had actually been burned. The fire took place when Parraz was not at home because he was taking part in a drug deal with an undercover police officer, for which he was arrested on the 12th. (RT 434.) As Detective Sumpter testified, [Parraz] indicated that [Petitioner] had threatened him that he was gonna burn his house down. Told him that essentially watch your back. With this [Parraz] knew that his house was going to be burnt down on the night of the 11th, and that was why he had taken his wife to the Motel 6 in Tulare and had spent the night there."

1    (RT 534.)  In terms of trustworthiness and reliability, Parraz's account of Petitioner's threat was

2    corroborated by Petitioner's "own admission to police that he told Ventura to burn down Parraz's

3    home, as well as Rivera's report of [Petitioner's] threat and Haro's testimony that [Petitioner]

4    was angry at Parraz for the theft of drugs." (Exhibit D, Opinion, at 15.)  The mere fact that

5    Petitioner was being arrested for selling methamphetamine to an undercover agent the day the

6    threats were reported does call into doubt the reliability of such statement.  As stated by the Court

7    of Appeal, "[t]he fact that Parraz reported [Petitioner's] threats to police when he confessed to

8    participation in an array of drug manufacturing, dealing, and theft supports the credibility of his

9    account, as he apparently decided to come clean on matters related to his drug operation."

10   (Exhibit D, Opinion, at 15.)  Based on these circumstances, the state court's findings of facts are

11   not unreasonable.

12         Nor is the Court of Appeal's decision contrary to or an unreasonable application of

13   Supreme Court authority.  Applying the clearly established pre-Crawford law as explained *supra*,

14   Parraz was unavailable as a witness and the statements under California Evidence Code 1370 are

15   akin to the firmly rooted spontaneous utterance hearsay exception and not necessarily

16   inadmissible.[3] In any event, as explained above, the statements contained particularized

17   guarantees of trustworthiness.  Because the Court of Appeal's decision was neither contrary to or

18   an unreasonable application of Supreme Court nor an unreasonable determination of the facts in

19   light of the evidence presented, the Court need not and does not address the alternative harmless

20   error analysis, and the instant claim should be denied.

21                              <u>RECOMMENDATION</u>

22         Based on the foregoing, it is HEREBY RECOMMENDED that:

23   1.    Petitioner's claim that the trial court erred in admitting Parraz's statement

24         regarding his threat of arson be DENIED; and

25

26         [3]  The Court of Appeal specifically noted that Petitioner conceded "that the 'threat' exception to the bar on

27   hearsay has been sufficiently likened to the exception allowing admission of spontaneous utterances, a firmly rooted
     exception to the bar on hearsay, so that the admission of testimony under this statutes does not necessary violate the

28   confrontation clause." (quoting <u>People v. Hernandez</u>, 71 Cal.App.4th 417, 423-424 (1991).)  (Exhibit D, Opinion, at
     13.)

1       2.      The Clerk of Court enter judgment in favor of Respondent.

2       This Findings and Recommendation is submitted to the assigned United States District

3   Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of

4   the Local Rules of Practice for the United States District Court, Eastern District of California.

5   Within thirty (30) days after being served with a copy, any party may file written objections with

6   the court and serve a copy on all parties.  Such a document should be captioned "Objections to

7   Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served

8   and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the

9   objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

10  636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time

11  may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th

12  Cir. 1991).

13      IT IS SO ORDERED.

14      **Dated:    March 24, 2008**                    _____ **/s/ Dennis L. Beck**_____
                                                        UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28